U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 SEP 11  PM 4: 25

CLERK

BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 2:16-cr-71
)
ANTHONY SMITH )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION FOR A JUDGMENT OF ACQUITTAL
## OR IN THE ALTERNATIVE FOR A NEW TRIAL
(Doc. 171)

Pending before the court is Defendant Anthony Smith's motion for a judgment of acquittal or in the alternative for a new trial. (Doc. 171.) Defendant was charged in a two-count Superseding Indictment as a felon in unlawful possession of ammunition and a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). On January 25, 2018, a jury convicted Defendant of both offenses. Defendant moved for a judgment of acquittal at the close of the government's case in chief, and renewed that motion at the close of all evidence. Both motions were denied.

Pursuant to Fed. R. Crim. P. 29(c), Defendant seeks a judgment of acquittal notwithstanding the verdict, arguing that the government's evidence at trial was insufficient to support his conviction. In the alternative, Defendant moves for a new trial under Fed. R. Crim. P. 33(a) on the grounds that the testimony of one witness, which he contends implied misconduct on the part of defense counsel during investigation of the case, prejudiced the jury to the extent that the interest of justice requires a new trial.[1] The government opposes the motion, contending sufficient evidence supports the jury's

---

[1] In his reply brief, Defendant raises thirteen additional grounds for a new trial, all but one raising challenges to the proper interpretation of the evidence or lack thereof as opposed to its admissibility. With regard to one evidentiary challenge, Defendant asserts that he "believes that there is a chain of custody violation related to Amanda Cahill's testimony regarding the firearm[,]" (Doc. 177 at 2, ¶ 7), but "deficiencies in the chain of custody go to the weight of the evidence, not its admissibility[.]" *United States v. Gorman*, 312 F.3d 1159, 1163 (10th Cir. 2002) (internal quotation marks omitted).

verdict and that the potentially prejudicial testimony offered by a government witness does not mandate a new trial.

The government is represented by Assistant United States Attorneys Owen C.J. Foster, Wendy L. Fuller, and William B. Darrow. Defendant is represented by Mark A. Kaplan, Esq.

## I. The Evidence at Trial.

At the four day trial of this case, the government called fifteen witnesses and introduced into evidence twenty-six exhibits. Vermont State Police ("VSP") Corporal George C. Rodriguez testified that, on April 19, 2016, he responded to a report from Sarah Mahoney that a vehicle had driven across her lawn causing damage to the property. She provided a description of the vehicle. Corporal Rodriguez was familiar with Ms. Mahoney as a previous source of information. Noting that a Maplefield's On the Run convenience store was located in the vicinity of Exit 19 off of Interstate 89, approximately four and a half miles from Ms. Mahoney's home, Corporal Rodriguez proceeded south from Saint Albans, Vermont to the convenience store and canvassed the parking lot. After entering the lot, he observed "a black SUV with temporary New Jersey plates[.]" (Doc. 163 at 65.) He testified that he stopped his marked patrol cruiser approximately "five or six spots from that vehicle[]" and reported the temporary license plate number to dispatch for verification. *Id.*

As he approached from the rear, Corporal Rodriguez initially observed "one person in the vehicle, which was the female operator." *Id.* at 66. He subsequently discovered that a young child was in the back seat and a male passenger was in the front seat in a fully reclined position. Quianah Arrington, the driver, identified herself and stated that her passenger's name was "Ant" and that she did not know his last name. When asked for identification, Defendant provided Corporal Rodriguez with a New York benefits card. A records check revealed that Defendant did not possess a valid driver's license and that he was a convicted felon. It was subsequently determined that Ms. Arrington had a suspended operator's license but she was not issued a ticket.

2

Defendant advised Corporal Rodriguez that Ms. Arrington was his wife, but Ms. Arrington denied this. She explained that she had known Defendant for approximately nine to ten months and that she had "run into him again to come up" to Vermont. *Id.* at 74. Corporal Rodriguez concluded that "nothing was adding up, nothing that [Ms. Arrington] was saying was making sense at that point." *Id.* at 74-75. In light of what he considered "suspicious" circumstances, Corporal Rodriguez requested consent to search Ms. Arrington's vehicle which she provided. *Id.* at 79. Ms. Arrington also informed Corporal Rodriguez that Defendant had a bag "in the trunk area of the vehicle." *Id.* at 80. During the course of his search, Corporal Rodriguez discovered a red bag. Inside the bag, he discovered large men's clothing consisting of a pair of shoes and a large red shirt and a plastic bag containing approximately twenty-four rounds of .22 caliber ammunition.

Upon discovering the ammunition, Corporal Rodriguez suspended his search of the black SUV and placed Defendant in handcuffs. He then returned to the vehicle and completed a search of the rear passenger compartment before moving back to the front seats. As he searched under the driver's seat, Corporal Rodriguez observed the barrel of a firearm pointing towards the front of the car, hidden among mechanical equipment used to adjust the seat's position. He testified that, due to the presence of the mechanical equipment, it was impossible to remove the firearm from the front side of the seat. In retrieving the firearm, Corporal Rodriguez did not wear gloves or otherwise do anything to preserve any fingerprints that might be found on it. However, "no case requir[es] fingerprint or DNA evidence to sustain a conviction." *United States v. Pinkney*, 644 F. App'x 478, 483 (6th Cir. 2016) (citing *United States v. Morrison*, 594 F.3d 543, 545-46 (6th Cir. 2010)).

Corporal Rodriguez extracted the firearm from the rear of the black SUV's driver's seat. He testified that, in his opinion, an individual seated in the fully reclined front passenger seat could have reached the butt of the firearm from under the driver's seat, but that someone seated in the driver's seat itself could not have accessed it. Examining the firearm, Corporal Rodriguez determined that it was a .22 caliber Colt

3

handgun. Ms. Arrington informed Corporal Rodriguez that the red bag belonged to Defendant. Defendant later discussed the stop during a recorded telephone conversation made from a correctional facility while he was awaiting trial. A rational jury could interpret this conversation as an admission by Defendant that the bag and firearm belonged to him.

After discovering the red bag, ammunition, and firearm, Corporal Rodriguez placed Defendant under arrest. During a "pat-down" search, he discovered Defendant's cell phone which he seized and placed inside the red bag after returning with Defendant to a VSP barracks. Following initial processing at the barracks, Corporal Rodriguez transported Defendant to Clinton County Correctional Center. During the transport, Defendant stated that "at least the gun wasn't loaded." (Doc. 164 at 23.)

During Corporal Rodriguez's testimony, the government introduced into evidence the red bag, the men's clothing, the ammunition, and the firearm. It established the chain of custody for those items through law enforcement witnesses. Corporal Rodriguez's patrol cruiser was equipped with a WatchGuard audio and video recording system which captured the scene at the Maplefield's On the Run convenience store. Corporal Rodriguez identified Defendant as the individual in the video during his testimony.

Ms. Arrington testified that she first encountered Defendant, whom she knew as "Ant," at the home of a mutual friend in New York City, whom she knew as "Rome." Ms. Arrington occasionally provided transportation for Rome and his associates in exchange for compensation. When Rome learned that Ms. Arrington was planning a trip to the Burlington, Vermont area in the spring of 2016 to visit a friend, he arranged for her to bring Defendant with her in exchange for payment. After meeting Defendant in Brooklyn, New York, Ms. Arrington stopped in Newark, New Jersey and then proceeded north to Vermont with Defendant and her daughter who was approximately eight years old.

Upon reaching Vermont, Ms. Arrington brought Defendant to the home of Russell Smith near Saint Albans. Defendant exited the vehicle, while Ms. Arrington and her daughter remained in the car. At some point, a man she did not recognize approached the

4

driver side window of her vehicle and she directed him inside the residence. Thereafter, Defendant emerged from the residence and reentered the vehicle carrying a bag which he placed in the trunk. Ms. Arrington subsequently identified the bag seized from Defendant and admitted into evidence as the bag she observed Defendant carrying when he entered her vehicle. With Defendant seated in the front passenger seat, Ms. Arrington's daughter in the back, and Ms. Arrington operating the black SUV, they proceeded to the Maplefield's On the Run convenience store where they encountered Corporal Rodriguez.

After Corporal Rodriguez spoke with Ms. Arrington, he left her vehicle to check on the status of her operator's license. Defendant asked her daughter to hand him the bag he had placed in the trunk. Defendant then opened the bag, retrieved a firearm, and asked Ms. Arrington to tell Corporal Rodriguez that the firearm belonged to her. She declined and testified that Defendant then reached in the back seat before Corporal Rodriguez returned. After Corporal Rodriguez found the firearm under the driver's seat, Ms. Arrington told him that it "shouldn't have been under [her] seat[]" and that "it wasn't [hers]." *Id.* at 120. Ms. Arrington agreed that someone seated in the reclined passenger seat could have reached the location where the firearm was hidden. She further testified that she did not let other people drive her vehicle. Although Defendant points out that Ms. Arrington was not asked to identify the firearm at trial, there is no evidence that she could reasonably be expected to do so. Consistent with her testimony, she claimed to have never seen the firearm prior to Corporal Rodriguez retrieving it from her vehicle. There was no evidence that Corporal Rodriguez asked Ms. Arrington to examine the firearm at any time. A rational jury could therefore conclude that it was not necessary for her to do so at trial in order to establish the firearm was the same one retrieved from her vehicle. Other witnesses established that link and Defendant provided corroboration when he noted that at least the firearm was not loaded, revealing both his knowledge of the firearm's existence and a fact about its condition that would be unknown by someone who had never possessed it.

Similarly, although Ms. Arrington testified she could not be sure the red bag belonged to Defendant, a rational jury could find that in light of Ms. Arrington's testimony that she did not let others drive her vehicle, and the men's clothing in the bag that appeared to match clothing Defendant wore in a photo, the red bag belonged to Defendant.

After Defendant's arrest, Ms. Arrington received a ride to a Pizza Hut in Saint Albans where the same man she had encountered outside Mr. Smith's home gave her cash. The following evening, she drove her own vehicle back to New Jersey, where she sent "Rome" part of the cash she received at the Pizza Hut and kept the rest for herself. A friend of Ms. Arrington's testified and corroborated the events at the Pizza Hut. She admitted that she had previously been dishonest about these events because she was with her children and did not want to risk a referral to child protective services.

During her testimony, Ms. Arrington acknowledged that she had previously refused to comply with a subpoena to testify before a grand jury in connection with this case, resulting in her arrest by the United States Marshal Service. She admitted that she lied under oath when she eventually testified on two occasions before the grand jury, and that she also lied to agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") who were investigating the events at the convenience store. On cross-examination, Ms. Arrington explained:

> I lied because, as I said before, I was scared. No one cared about our safety, and I didn't want to talk to them. I didn't want to talk to anybody. I didn't want to talk about it. But you called my house, and I was scared, so I told them the truth.

*Id.* at 166. Following this exchange, defense counsel moved for a mistrial, contending that Ms. Arrington was "creating the impression that [defense counsel] did or said something to scare her[] . . . I was under the impression the Court told the prosecutors to tell her not to get into that area." *Id.* The court denied the motion, noting that defense counsel "elicited" the potentially prejudicial testimony and that a curative instruction was sufficient to address any potential prejudice caused by Ms. Arrington's testimony. *Id.* The court then instructed the jury as follows with the parties' consent:

6

> Ladies and gentlemen of the jury, I am going to strike the witness's last
> answer and ask you to disregard it. And I am going to give you what's
> called a curative instruction, and it is as follows: A defense attorney or a
> defense investigator has every right to contact a witness in a case. In fact, if
> he or she is not doing that, they are not doing their job. The Court has no
> evidence that the defense attorney or defense investigator did anything
> improper in this matter. Let's have the next question.

*Id.* at 169.

The government also called Russell Smith, the resident of the home Defendant and
Ms. Arrington parked outside on April 19, 2016. Mr. Smith testified that, after receiving
a telephone call, he returned from his girlfriend's home to find Ms. Arrington parked
outside his residence. When Mr. Smith entered his residence he found "a man standing
in the house." *Id.* at 199. Mr. Smith identified the man in his house that night as
Defendant and identified a photograph of Ms. Arrington as the "lady driving" the vehicle
he discovered outside. *Id.* at 200. Mr. Smith testified that Defendant told him he was
"here to collect for Unc[.]" *Id.* at 202 (internal quotation marks omitted). Following this
exchange, Mr. Smith gathered as much money as he could from friends, family, and
neighbors and proceeded to the Pizza Hut in Saint Albans, where he delivered the funds
to Ms. Arrington.

At trial, the government also presented several law enforcement witnesses. ATF
Special Agents Amanda Cahill, Scott Murray, and Samuel T. Brown established the
firearm and ammunition seized from Ms. Arrington's vehicle were the same firearm and
ammunition introduced at trial. ATF Special Agent James J. Berger, an "interstate nexus
expert[,]" testified that the firearm recovered from Defendant and introduced into
evidence was operable, manufactured in Connecticut, and "traveled in or affected
interstate commerce." *Id.* at 223, 231. Agent Berger further testified that the ammunition
seized was manufactured in Minnesota and traveled in or affected interstate commerce to
reach Vermont. Although Defendant contends that Agent Berger's name does not appear
on the evidence tag, this does not render his testimony inadmissible. Moreover, contrary
to Defendant's contention, the government was not required to prove whether the firearm
had ever been in New York or New Jersey or whether it had ever been reported stolen.

ATF Special Agent Derrick Weems, a fingerprint specialist, testified that he attempted to locate latent fingerprints on the ammunition and firearm seized during Defendant's arrest but that he did not find sufficient evidence to make a comparison between latent prints on the weapons and a national fingerprint database. Agent Weems further explained that, in his experience, ATF recovers latent prints from metal, revolver-type firearms approximately five percent of the time. Similarly, he testified that ATF recovers useable fingerprint evidence from small caliber ammunition cartridges in less than one percent of cases.

Finally, ATF Special Agent Matthew Ekstrom recounted his examination of Defendant's Apple iPhone, also seized at the time of Defendant's arrest. Agent Ekstrom described his use of Cellebrite software to extract records of Defendant's text messages and photos stored on his phone. The government introduced certain text messages and photographs into evidence. One photograph depicted Defendant wearing a shirt which appeared to be the same red shirt recovered from the bag seized during Defendant's arrest. Several recovered text messages had been deleted just prior to Defendant's arrest including the following exchange with an unknown contact:

**Defendant:** Ight say less billy I'm on deck.

**Unknown Contact:** Copy I got you.

**Unknown Contact:** Yo what's the word billy.

**Unknown Contact:** Y'all good.

**Defendant:** Copy.

**Defendant:** The man got us.

(Doc. 166 at 99-103) (internal quotation marks omitted). A subsequent exchange occurred as follows:

**Unknown Contact:** Y'all don't have that with y'all right.

**Defendant:** Yeah we do.

**Unknown Contact:** Why.

**Defendant:** We was on our way back.

**Defendant:** Dam boy.

8

**Defendant:** We might be good though.

*Id.* at 103-104 (internal quotation marks omitted). Following Agent Ekstrom's testimony, the government offered into evidence a stipulation by the parties that Defendant was convicted of a crime punishable by a term of imprisonment exceeding one year in July 2006.

After the close of the government's case in chief, Defendant called five witnesses. Several of these witnesses testified that Russell Smith, in their opinion, does not have a reputation for truthfulness in the community. In addition, Defendant called Kevin Burke, a private latent fingerprint expert, who testified that he was similarly unable to obtain fingerprints from the firearm and ammunition seized during Defendant's arrest.

## II.    Conclusions of Law and Analysis.

### A.    Whether the Evidence at Trial was Sufficient to Sustain the Jury's Verdict.

In order to convict Defendant, the government was required to prove beyond a reasonable doubt that: (1) he was convicted, in any court, of a crime punishable by imprisonment for a term exceeding one year; (2) he knowingly possessed ammunition (Count I) or a firearm (Count II); and (3) that the possession charged was in or affecting interstate or foreign commerce. Defendant contends that the government's evidence at trial was insufficient to permit the jury to conclude beyond a reasonable doubt that he was in fact in possession of ammunition or a firearm. He highlights the lack of useable fingerprints and the fact that Ms. Arrington admitted to lying in a grand jury proceeding and to investigators. As she was the only witness who testified that Defendant had a firearm and ammunition in his possession, the jury should have disbelieved her based on her prior false testimony. Defendant also contends that there is no evidence he actually sent the text messages which Agent Ekstrom recovered. Finally, he contends in his reply that there was insufficient evidence of the interstate nexus.

"A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'" *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (quoting *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994)). The test for sufficiency of

9

the evidence is "whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008), *cert. denied*, 555 U.S. 1148 (2009) (internal quotation marks omitted). It is permissible for a jury to have "base[d] its verdict entirely on inferences from circumstantial evidence, and the evidence need not have excluded every possible hypothesis of innocence." *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) (citation and internal quotation marks omitted).

The court may not grant a motion for acquittal if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this demanding standard, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

In considering the sufficiency of the evidence presented at trial,

the court must be careful to avoid usurping the role of the jury. . . . Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.

*United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted). The court must "resolve all . . . issues of credibility in favor of the verdict." *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000), *cert. denied sub nom Henderson v. United States*, 531 U.S. 909 (2000).

In this case, in the light most favorable to the prosecution, a reasonable jury could conclude beyond a reasonable doubt that the bag and the ammunition within it belonged to Defendant and that he was thus, at a minimum, in constructive possession of it. Evidence to this effect included the fact that the bag contained large men's clothing, in particular a shirt which Defendant was photographed wearing days before his arrest; the only occupants of the vehicle were Defendant, Ms. Arrington (a female), and a young

child; Ms. Arrington testified that the bag belonged to Defendant; and a recorded telephone call reflected Defendant's admission that the bag belonged to him.

Similarly, a reasonable jury could conclude that Defendant possessed the firearm. Corporal Rodriguez testified that the firearm was only accessible to two of the black SUV's occupants: Defendant and an eight year old child. Ms. Arrington testified that the gun belonged to Defendant and that he asked her to falsely claim it was hers. A reasonable jury could conclude that Defendant's observation to Corporal Rodriguez that "at least it wasn't loaded" during his transport to Clinton County Correctional Center reflected his possession of the gun and his knowledge of its condition. With regard to the third element, a rational jury could conclude that neither the firearm nor the ammunition were manufactured in Vermont and thus must have "travelled" in interstate commerce in order to be found in Ms. Arrington's vehicle while parked at a convenience store in Vermont.

The sufficiency of the evidence with respect to the first element of both Counts, a prior felony conviction, is not in dispute. Because a rational trier of fact could have found beyond a reasonable doubt that Defendant possessed the firearm and the ammunition, Defendant's motion for a judgment of acquittal must be DENIED.

## B. Whether Quianah Arrington's Testimony So Prejudiced the Jury that a New Trial is Required.

Defendant argues that Ms. Arrington's testimony regarding defense counsel's contact with her prior to Defendant's trial so prejudiced the jury against both counsel and Defendant himself that justice requires a new trial. Fed. R. Crim. P. 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). The court must also "strike a balance between weighing the

evidence and credibility of witnesses and not wholly usurp[ing] the role of the jury." *Id.* at 133 (internal quotation marks omitted).

Ultimately, the court must determine "whether letting a guilty verdict stand would be a manifest injustice[,]" and "[t]o grant the motion, [t]here must be a real concern that an innocent person may have been convicted." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013), *cert. denied*, 135 S. Ct. 400 (2014) (internal quotation marks omitted). While the court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," the court "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

Here, several factors demonstrate that no "manifest injustice" will result if Defendant is not granted a new trial. *Aguiar*, 737 F.3d at 264 (internal quotation marks omitted). The court struck the testimony in question, ordered the jury to disregard it, and provided a curative instruction which emphasized that there was no evidence that defense counsel acted inappropriately. The court affirmatively informed jurors that it is permissible for an attorney or an investigator acting on behalf of a criminal defendant to contact potential witnesses and that, in fact, it was part of an attorney's job. In its written and verbal jury instructions, the court reminded the jurors to disregard any testimony that was stricken from the record. The jury is presumed to have heeded the court's instruction. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant") (citation and internal quotation marks omitted).

Defense counsel elicited the potentially prejudicial testimony on cross-examination, and the testimony had only limited prejudicial value. At most, it suggested that a witness who was already in fear was further unnerved by a phone call from a lawyer. Ms. Arrington made no allegations that Defendant himself contacted her or threatened her in any manner. Contrary to Defendant's contention, the government did

12

not fail to apprise the jury that Ms. Arrington was compelled to testify when she was subpoenaed before the grand jury and, notwithstanding a grant of immunity, she had lied under oath. In light of the overwhelming evidence supporting the jury's guilty verdict, the court is not presented with "a real concern that an innocent person may have been convicted." *Aguiar*, 737 F.3d at 264 (internal quotation marks omitted). Accordingly, Defendant's motion for a new trial is DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motion for a judgment of acquittal or in the alternative for a new trial (Doc. 171) is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _11th_ day of September, 2018.

Christina Reiss, District Judge
United States District Court